We have four cases on the calendar this morning. One patent case from the PTAB, two claims cases, a veteran's case, and one of the claims cases will be heard on the briefs and not be argued. The first case is Mylan Pharmaceuticals et al. v. Research Corporation Technologies, 2017, 88, 89, and 91. Mr. Parmalee. Thank you, Your Honor. Steve Parmalee for appellants. May it please the court. We believe the board's decision can be reversed due to at least three errors which we set forth on page 33 of our opening brief. But basically, the board substituted a reason offered by RCT to modify the lead compound in place of our reasons, asked petitioners to modify it. How did 3L get to be a lead compound? 3L was the most potent drug of any of those enumerated in the Cohen 1991 reference. Then where was the motivation to modify it if it was such a good drug? The motivation was that a person of ordinary skill would have looked at that compound and seen that it had an NO bond. NO bond, this bond between two heteroatoms, was considered to be unstable at a physiological pH, and it was a bond that would have been easily fixed. But didn't Cohen itself indicate that the compounds, those compounds were all stable? I don't, I think there were some melting point studies, but I don't know that they considered them stable. I think, though, that any person of ordinary skill in the art looking at that compound would see that the NO bond is very rare in pharmaceuticals. I think there's only one compound on the market that has an NO bond. So a poster would see that that's a potentially unstable bond, and it's so easily remedied. And that's why we said it should be selected as a lead compound in the first place along with the reason that it was the most highly potent compound in that list of compounds. In fact, it was more potent than two of the most highly market, or most commonly used AEDs on the market, that being phenytoin and valproate. Well, where was the motivation to change the NO to a methylene? Well, the motivation was, it's what was a poster would know to do, because that's a standard substitution under bioisosteic conditions. Well, that seems very strange to me, that methylene is an isosteer of the amino oxide. And if, in fact, the oxyamine was so unusual, then there really isn't an isosteer for that. And I see the Silverman paper that lists it horizontally, but there's also oxygen sulfoselenium. Well, I think part of the problem in substituting those other bioisosteers would be if you put an oxygen next to an oxygen, then you've got a peroxide. If you put a sulfur in there, you've still got a bond between two heteroatoms. Only carbon would solve that problem, only the methylene substitution, and it was an easy fix to do. As I understand, at least part of your argument is predicated on the theory, which is supported by Cone, I guess, 91 and 93, that having an oxygen two atoms removed from the alpha carbon is associated with high potency. That was, you're absolutely right. OK, but the other point that's made by Cone, and I think this is principally, if not exclusively, in Cone, 94, is that having an amino group at the alpha carbon site is also highly associated with potency. Now, why then would you throw one of those two indicators of potency out the window in favor of simply having the one? I understand your argument about the labile state of the NO bond, but is there any other reason, any other inducement to get rid of the nitrogen? Well, I think the Cone, 94 paper you're referring to was sort of a structure activity relationship study on that nitrogen and what they could attach to it. So there's examples in that paper of compounds with the nitrogen that are duds as far as activity. Oh, sure. There are lots of duds in all of Dr. Cone's work, but the ones that are good, with a couple of exceptions that you point out, 2C and 2D, I guess, are two of the exceptions, but most of the ones that are good do have nitrogen. And he does say that the results, this is 94, documented that excellent protection can be achieved by incorporation of a basic alpha carbon amino substituent. So that's a pretty strong pointer in the direction of holding on to that alpha carbon  If you look at Cone 91, apart from the Cone 94 SAR studies and the effect of electrophiles, electron-electron groups, and all that that they were doing in 94, if you go back to Cone 91, where the key to potency was really that carbon, or the oxygen atom, two atoms removed from the alpha carbon. That's the key to potency. So you can make, you can have a nitrogen at the alpha carbon. You can have a carbon at the alpha carbon. There's examples in Cone 91 of highly potent compounds, and just switching the nitrogen to a carbon was responsible for perhaps a minor decrease in potency, and that's what the board recognized in the institution decision. It would be a small decrease in potency. 3L was so highly potent, it was more potent than any of the others, that a POSA would have known you had room to work with that. Part of pharmaceutical development is optimizing to give and take. If I have high potency, maybe I have a little bit of room. Just because you have high potency doesn't mean you can give a drug to a person if it's unstable in vivo, or unstable in vivo. So if you can remedy the instability that would occur in vivo by putting in, making a simple substitution at the carbon for the nitrogen, then you've taken care of that Let me ask you about your battling experts. In the red brief at 45 and 46, the epileagues discussed Dr. Rausch and your argument that he failed to account for physiological influences such as solvent molecules, i.e. water, or binding site interactions. And then they say, Dr. Rausch explained, usually the solvent of interest is water. To see what the conformation in water is. But that becomes, frankly, much less relevant when you're looking at the conformation of a molecule when bound in a protein. Because when bound in a protein, there's not water associated with it. And then they discussed, Rausch explained, physiological influences. And they say Dr. Wang did not identify any alternate method that would have accounted for those physiological influences. Where in the record does he, if he does? Well, I'm not sure. The physiological difference is that the carbon at that position would have been standard. I'm not sure if that's the question you're asking for about Dr. Wang. Yeah, what I'm asking is to respond to their argument that he doesn't identify any alternate method that would have accounted for those physiological influences. We have the testing in the animals from compounds that do have the carbon and oxygen. So that's in cone 91. I don't know that they tested stability. So Dr. Wang didn't address it then? I don't recall that he did or not. The board made fact findings that the change of the nature that occurred here would have led to a reduction in activity, significantly different conformation and biological activity. Those are fact findings, right? We have to give them deference. There's substantial evidence for it, but we pointed out that there's not. The board went through several fact findings that weren't supported. And that makes some analogous comparisons between compounds. And we point out in our opening brief and then in the reply why those were inapt. For example, one of them was putting, the board said, well, you can simply put two oxygens together. You can substitute an oxygen there. Well, the fact of the matter is if you put an oxygen next to an oxygen, you're going to generate a peroxide. So that's an example of how the board really got a little off track in doing that sort of fact finding that you're referring to, Your Honor. You called Dr. Rush's modeling crude because he manually rotated bonds. Right. Where in the record is there evidence by Mylan or by Dr. Wang of a less crude method? Well, Dr. Wang and Mylan did not do computer modeling. This was a post hoc computer modeling that Dr. Roush engaged in. And it was incomplete. We believe, and we point out why it was incomplete. It doesn't, he didn't rotate the carbons and things like that. So we felt that the computer modeling was just another in-app comparison. Again, post hoc. We can save the rest of your time if you have. All right, yes, I'll reserve time. Thank you.  Thank you, Your Honor. I would like to start with a question that, Judge Lurie, that you asked. And that is, how did 3L get to be a lead compound? And when you read- If you could, and I hate to jump on you right at the beginning, but since it's a discrete issue we're here with respect to appealability, I want to make sure that we get a chance to talk about that. So if you don't mind, if you could postpone the 3L discussion for just a minute. I take it that your position really is one of statutory construction. There isn't, I mean, we talk about the question of whether there's a sufficient interest here for an appeal and so forth. But it really is just statutory construction, is it not? The question of whether a party for purposes of Section 319 is the same as a party for purposes of Section 315C. That's really all it is, right? That's quite true. We're not arguing an Article 3 standing issue. We're arguing that under these circumstances, a joint party who had- And that's the word the statute uses. I will use that. A joint party who was time barred from bringing its own idea- I understand the argument. But just to cut to the chase here, your argument would require us to conclude, I take it, the word party in Section 319 means something other than the word party in Section 315C. That's correct, is it not? That is correct. Well, go ahead. You can give an explanation of that. I'll put a little gloss on that and then I'll turn back to where I was starting. And the gloss I would put on that is that the party of 315C is in the discretion of the director or the board in this case. And not a statutory right. And in this case, the way they described themselves was an understudy. Yes, they're a party under 315, but their role in the IPR was as an understudy. They did not have and did not take full rights of participation. And it seems very odd that when the party that actually filed the petition can't appeal, that the understudies do get to appeal. And unless your honor has more questions about that, I'm going to flip back to- Yeah, that's fine. To the other issue. And where I was starting, Judge Lurie, was your question about how 3L got to be a lead compound. And when you read the board decision, they did not decide that 3L was a lead compound. They assumed arguendo, and that's the term they used at page 817, that 3L was a lead compound. That's what the appellants were promoting. But we couldn't conclude here without remanding the case, I take it, that 3L really can't be the lead compound, because we can't affirm the board on reasons other than those given by the- I think that is absolutely right, your honor. So we're really kind of stuck with 3L as the lead compound, even if we really don't think it should be. And I'm not arguing that point other than to say it was an assumption, not a finding. And if that became important, I think you're right that it has to be remanded, that you can't decide it. But the question I was going to raise is, once 3L is regarded as a lead compound, why would someone of skill in the art have changed it? And I'll go back to where, Judge Bryson, where you went, and that is Cone 1991 teaches that the best compounds had a nitrogen at the alpha carbon. Cone 1994 then says it's important to have an amine, a nitrogen, at the alpha carbon in order to get good activity. Why would someone change that? And there is no reason someone would change it. And Mr. Carmely referred to a small reduction in potency. There's no evidence as to what the reduction in potency would have been. That number that they put in their brief, it didn't exist in the prior art. That was just something that more or less was made up. So that was unknown. But on the bioisosterism point, because that is the basis for their conclusion as to why you would do this, the evidence... Maybe I misunderstand the record here. But I thought that the argument about the small difference in potency was with respect to the comparison between compounds 3A and 2A, which is to say that when you go from the nitrogen to a CH2 group at the alpha carbon site, you have a reduction in activity. But it's a very small one relative, from 65 up to 76, modest increase. 15, 16%. But that's their argument. Their argument is, therefore, there wouldn't be this potency potential. Isn't such a big deal that you wouldn't have other reasons that would overcome it to get rid of the nitrogen, such as the stability and synthetic factors. Right. And I think that is their argument. My point was that when it comes to switching from a methoxyamino to a methoxymethyl, which is what they're saying here, there was no evidence as to what effect that particular substitution would have. On the stability point, Your Honor, the only... Other than the inferences one might draw from bioisosterism. Right. And I'd like to get back in a minute to the bioisosterism point. But before I do, on the stability, there is no evidence anywhere in this record that there was a stability issue with 3L. There is none. The only evidence of stability is in the Cone 91 paper. This is at A2406-2407, which says, it's right at the top of 2407, that these compounds are stable. That is the only evidence. We do know a little more than that. We know that that compound, which is called stable in the Cone paper, was injected into a mouse, that they were able to measure the effects that that had. And you would think that that would be some evidence that it was stable. But my point is, they put in no evidence that there was instability problem with this particular compound. Tell us what you wanted to tell us about bioisosterism. I do want to talk about bioisosterism. And it is a general principle. The Silverman chapter is out there. And as your honor pointed out, it says that the methylene is bioisostere for the amino group. But it also says oxygen, sulfur, selenium. And what Dr. Cone did in his experiments in 1991, his experiments in 1993, in his two articles, is he compared the efficacy and also the toxicity, to some degree, of the same compounds. But some of them had nitrogen at the alpha carbon. Some had carbon. Some had oxygen. Some had sulfur. None had selenium. But he compared those four. And every single time that he did a comparison, the activity was reduced when you went from a nitrogen to any of those other isosteres. And the board specifically found that. This is in A28. Does that include going to the methylene compound, which is claimed? Yes, it does. Every time there was a substitution from an amine to a methylene, there was a reduction. The most graphic example of that is the isoxazolidine to the two tetrahydroforans, which were in the 1993 article, where there was a dramatic reduction two to three times in activity. But what the board found, because they looked at all this evidence, was that, and this is at A28, petitioner does not identify any specific example in the prior art of record in which substitution of a non-nitrogen-containing moiety for a nitrogen at the alpha carbon substituent failed to reduce potency. I wonder why glucosamide, then, is the product that was developed, not the 3L compound. And that's an interesting question. But I will say that we've litigated this case before in the district court, in this court, and other places, that it was surprising to the people who ultimately tried it. And they tried hundreds of different compounds. They tried to find the best. And it wasn't, and this isn't in the record anywhere, I don't think, but it wasn't like they went from 3L in 1991 to glucosamide. It was years and years of research later. Tell us about the Ligal thesis. Doesn't that disclose the same claimed compound for the specified use? No, not at all. One, it's not part of the record in this case, but was not one of the grounds for institution. But the Ligal thesis discloses aracimate 107E. It does not disclose what became glucosamide. And it also discloses no pharmacological data, nothing that would lead someone to use that compound. In fact, it's in a group that's, it's in the Ligal thesis, of compounds that had terrible activity. But you're saying it wasn't instituted upon, and that wasn't appealed, and so that's... It's not part of this appeal. Mr. Blumenfeld, the question that troubled me about the two atoms removed from the alpha carbon theory of efficacy is that you responded to that very briefly in your brief. I think at page 43, you gave it a paragraph. And the response essentially was, well, there was also a reference to the alpha carbon amino substituent. And also, this was presented to the board. And therefore, since the board had this evidence, we shouldn't really pay much attention to it. Of course, if it hadn't been presented to the board, you'd be arguing waiver. So I think we need a more substantive answer than that. Do you have a better answer than the one you gave on brief? Well, Your Honor, there were several things that were disclosed by the art. And by the way, all of the art here was Cohen's art. But he disclosed that nitrogen was essential or was critical to getting good efficacy. He also had a theory, which he put in his papers about. Well, that's a little strongly put, isn't it? I mean, he indicated that it was associated frequently with good efficacy. But there are certainly compounds that are in the list that have good efficacy that don't have the amide, right? The compounds, Your Honor, that had good efficacy that did not have nitrogen at the alpha carbon were, by and large, heteroaromatic compounds. They were things that had rings. Were they aromatic or were they just cyclic? They were aromatic. They were both. They were cyclic. And there were some compounds like the tetrahydroforan that I talked about that was not aromatic and had bad efficacy. But if you look at the data, the 10 most efficacious compounds, two were 3L and 3N. The nitrogen-containing compounds. And the other eight, I believe, were all heteroaromatic compounds. And it is correct that Dr. Cohen also mentioned that it looked as though having a heteroatom, two atoms from the alpha carbon, was important. But that didn't make the other things unimportant. The heteroaromatic ring was important and the nitrogen was important. One thing he never said was important was having a methylene group there. And in fact, if you look at the data and the only data we had, there was not a single compound with a carbon at the alpha carbon that was something that anyone was interested in. Certainly, you're not hearing it from the other table. But there's nothing in the literature where anyone was interested in doing that. Not until glucosamide became a product. Well, but the methyloxymethyl group added to compound 3A, for example, made a whopping difference in efficacy. It was much better with the methyloxymethyl group, was it not? When you got to, when you went from compound 3A to compound 3L. And that was a pretty strong indication that. When you went from, that was going from an amine to. Right, true, true. That's right. But the point is that that is showing potentially the efficacy of the oxygen, two atoms removed from the alpha carbon, right? That may have had some contribution. That certainly was not the conclusion that Dr. Cohen drew when he wrote his 1994 article saying having a basic alpha carbon amine was critical. And he mentioned the other thing, but it was both things. Nobody ever said having a carbon at the alpha carbon and having a heteroatom removed by two atoms made a good compound. And you're looking at what, two things. One, what would a person of skill in the art have come away from looking at what was in the prior art? And second, more importantly, what did the board found? And the board considered both of those things, and it found that there was no reason and no reasonable likelihood of success from the prior art to go from methoxy amino to methoxymethyl. Thank you, counsel. Thank you, your honor. Mr. Connolly. You have four minutes if you need it. Thank you. There was a question about remand for determination of whether 3L was a lead compound. Although we don't think that's necessary, the case could be reversed as is. But if there is a remand, then we think that the other grounds of institution, or the other grounds in the petition that weren't instituted, the board should be instructed to institute pursuant to SAS. There was also some questions about whether you can modify a lead compound for particular reasons such as potency. Well, you can modify a lead compound for a variety of reasons. It doesn't have to be just one reason. I think the law on that is pretty well established. Even under KSR, it doesn't have to be one particular reason to modify. Well, housekeeping question. Did you raise valproate before the PTAP? Yes, your honor. Where is that? We'll have the site for you. Okay. Thank you. My colleague, there was also the standing issue. My colleague may find Congress's statutory framework odd, but the remedy is with Congress as far as standing, not with this court. There's no evidence of record that Argentum, the original petitioner, couldn't have appealed. There's no evidence on that point at all. As a matter of efficiency before the board, we did agree to take a backseat role, and the parties to speak as one voice. That's done as a matter of efficiency in many jurisdictions. I'm not sure that that's just an accommodation on your part. I think, at least in light of some of our case law, that you may have been required to take a backseat, weren't you? If you look at the NIDAC concurring opinion, doesn't that suggest as much? I don't know that the concurring opinion does. I know it's a matter of board practice. That's what they want to see is the party speaking with one voice for a matter of efficiency in front of the agency. Okay. My colleague also says there was no evidence of instability. The NO bond is the very reason that RCT said you would ignore 3L in the first place because of that potential instability. It's a seesaw analysis that they're trying to conduct, and that's exactly what KSR prohibits. Another issue was the Ligal thesis that came up. That Ligal thesis is in the record. We offered it as an effort to address the secondary considerations. It wasn't instituted upon, right? It wasn't instituted upon because there wasn't evidence of its status as a printed prior art publication at the time because much of that evidence was under seal at the district court, and it didn't become unsealed until after the board had already instituted. It's not part of the board decision, is it? Because it wasn't instituted upon. It's part of the record because we then offered it as prior art to be considered as the closest prior art in the consideration of the secondary or addressing the secondary considerations. So it is in the record. It just wasn't available earlier. It's in the record but not in the decision of the board that we're reviewing, right? I will have to check and see if they mentioned the Ligal thesis. I believe they ignore it completely, which we think is error in itself. Why was it unavailable as under seal? I'm not privy to the thinking or what was going on between the parties at the time. It wasn't otherwise available in the community? Where the Ligal thesis was kept, the University of Houston library, the University of Houston refused to cooperate as far as making their librarians available, it's my understanding, for providing the testimonials to their procedures. I just have a few minutes, a few seconds left. If there's any further questions, Your Honor, we think this case really should merit reversal. Thank you, counsel. We'll take the case on revising.